### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| REFINERY INDUSTRIES, INC. | : | |
|---|---|---|
| | : | |
| v. | : | NO. 02-CV-4847 |
| | : | |
| SCOTT TECHNOLOGIES, INC. | : | |

### ORDER

**AND NOW**, this _____ day of _____, 2003, upon

consideration of Defendant Scott Technology, Inc.'s Motion for Summary Judgment and

the opposition thereto, it is hereby **ORDERED** that the Motion is **GRANTED** and

judgment shall be entered dismissing all of Plaintiff Refinery Industry, Inc.'s claims with

prejudice.

BY THE COURT:

_____

**STEWART DALZELL, J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REFINERY INDUSTRIES, INC.          :
                                   :
                                   :      NO. 02-CV-4847
            v.                     :
                                   :
SCOTT TECHNOLOGIES, INC.           :

## ORDER

AND NOW, this _____ day of _____, 2003, upon

consideration of Defendant Scott Technology, Inc.'s Motion for Summary Judgment and

for a Continuance of the March 20, 2003 Arbitration Hearing Pending a Ruling on

Summary Judgment, it is hereby **ORDERED** that Defendant Scott Technology, Inc.'s

request for a continuance is **GRANTED** and the arbitration is stayed pending a ruling on

the Motion for Summary Judgment.

BY THE COURT:


_____
**STEWART DALZELL, J.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


REFINERY INDUSTRIES, INC.      :
                                    :

      v.                             :      NO. 02-CV-4847

                                        :

SCOTT TECHNOLOGIES, INC.       :


## MOTION FOR SUMMARY JUDGMENT AND FOR A
## CONTINUANCE OF THE MARCH 20, 2003 ARBITRATION HEARING
## <u>PENDING A RULING ON SUMMARY JUDGMENT</u>

        Pursuant to Federal Rule of Civil Procedure 56, Defendant Scott

Technologies, Inc. moves for summary judgment.  The grounds for the Motion are set

forth in the accompanying Memorandum of Law.

                           Respectfully submitted,


                                             
                        John G. Harkins, Jr., Esquire (04441)
                        Barbara Brigham Denys, Esquire (78562)
                        HARKINS CUNNINGHAM
                        2800 One Commerce Square
                        2005 Market Street
                        Philadelphia, PA 19103-7042
                        (215) 851-6700


                        Attorneys for Defendant
                        Scott Technologies, Inc.


Dated:  March 10, 2003

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REFINERY INDUSTRIES, INC.** | : | |
| | : | |
| **v.** | : | NO. 02-CV-4847 |
| | : | |
| **SCOTT TECHNOLOGIES, INC.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF SCOTT
TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT AND
FOR A CONTINUANCE OF THE MARCH 20, 2003 ARBITRATION HEARING
PENDING A RULING ON SUMMARY JUDGMENT**

## INTRODUCTION

Defendant Scott Technologies, Inc. ("Scott") files this memorandum in support of its motion for summary judgment seeking judgment in Scott's favor on all of the claims brought against it by Plaintiff Refinery Industries, Inc. ("Refinery"). As this matter is scheduled for arbitration on March 20, 2003, Scott seeks a continuance of the arbitration hearing pending a ruling on Scott's motion for summary judgment.

Refinery pled guilty on November 9, 2000, to a charge of knowingly and willfully violating and attempting to violate Executive Order No. 13059, which prohibits the export of goods, technology, and services from the United States to Iran, and to a third country with knowledge or reason to know that such goods, technology and services were intended for transshipment and reexportation to Iran, in violation of Title 50 United States Code, Sections 1701, 1702, and 1705. Refinery obtained the goods that were intended for Iran -- gas testers used to detect natural gas leaks -- from a division of Scott. A portion of those gas testers were seized by U.S. Customs and Refinery agreed to the forfeiture of those gas testers.

Remarkably, after having pled guilty to the violation of a trade embargo, Refinery seeks recovery from Scott for the amount it paid Scott for the gas testers it forfeited to the United States government.  The alleged basis for Refinery's claims is that Scott cooperated with the United States Department of Commerce ("DOC") and notified the DOC of its suspicions that the gas testers were ultimately destined for a prohibited country "without any disclosure or warning to Refinery" "for the purpose of using an opportunity to block a potentially illegal resale . . . to profit at Refinery's expense."  (Compl. ¶ 13.)

The facts are straightforward and not subject to reasonable dispute.  They are drawn from the record of the criminal action against Refinery in the United States District Court for the District of New Jersey and from the pleadings and deposition testimony in this case.[1] While Refinery may attempt to offer a variety of arguments in favor of its claims, it will not be able to point to a genuine issue as to any material fact that would prevent the Court from ruling on Scott's motion as a matter of law.  Any other outcome would serve only to reward Refinery's illegal activity and punish Scott's cooperation with the DOC.

## THE FACTS

Scott is a Delaware corporation, with its principal place of business in Cleveland, Ohio.  (Ans. ¶ 2.)  Refinery is a New Jersey corporation, with its principal place of business in New Jersey.  (Compl. ¶ 4.)

On March 3, 1998, Refinery placed a purchase order with Scott Aviation, a division of Scott Technologies, Inc., for 240 Scott D15 vapotesters with brass probes ("gas testers") through one of Scott's domestic brokers, Erich Mertz, representing that the purchase

---

[1]    Relevant portions of the criminal record, deposition transcripts and various other exhibits are contained in the Appendix which accompanies this memorandum ("App.").

was for a domestic resale.  (3/3/98 Refinery Purchase Order, App. Ex. A; Transcript of Deposition of Neil Doveala ("Doveala Dep."), App. Ex. B, at 116-119.)  Refinery sought the gas testers to fill a purchase order it had obtained from Starmount International, Ltd. ("Starmount").[2] The Starmount purchase order was for 245 gas testers.  (Starmount Purchase Order, App. Ex. D.) Scott became suspicious at the outset that the Refinery purchase order was ultimately destined for a prohibited country for several reasons:

- The order was for a substantial quantity of the type of gas testers used only by utility companies and Scott was unaware of any domestic utility company seeking the instruments (Doveala Dep. at 94-98; 118-119);

- The order was substantially similar to an inquiry that a company called Overseas Steel Corporation placed with Scott for 245 D15 Scott gas testers that was rejected because the gas testers were being purchased for resale to the National Iranian Gas Company in Tehran, Iran (*Id.* at 16-24, 73-75); and

- The delivery specifications that Refinery sought were not typical of a domestic sale despite the order being placed through one of Scott's domestic representatives. (*Id.* at 71-73; 116-118.)

Neil Doveala, the Manager of Instrument Sales for Scott Aviation at the time Refinery placed its purchase order, contacted the DOC shortly after receiving the order to seek guidance regarding how Scott should proceed.  (*Id.* at 79-80.)  The DOC advised Scott to go ahead with the sale but to keep the DOC informed.  Scott cooperated fully with the DOC.  (*Id.* at 120-127; *see also* Affidavit of Scott Dunberg, DOC ("Dunberg Aff."), App. Ex. E.)  This cooperation included notifying the DOC of any developments related to the sale.  For example, when Refinery requested six copies of the Certificate of Origin (a form required to export goods outside of the United States) for the first shipment, Scott notified the DOC.  (Dunberg Aff. ¶ 11.)

---

[2]    It is noteworthy that the President of Refinery, Mahmood Reza Hashemi, claims his brother put Starmount in touch with him to purchase Scott D15 gas testers.  Hashemi's brother is a retired employee of the National Iranian Gas Company and lives in Tehran, Iran.  (Transcript of Deposition of Mahmood Reza Hashemi ("Hashemi Dep."), App. Ex. C, at 23-27, 174-176.)

Starmount paid Refinery $14,387 toward the first shipment on March 20, 1998, and Refinery does not dispute that Starmount also paid for the balance of the first shipment. (Hashemi Dep. at 59-60; 3/20/98 Funds Transfer Advice, App. Ex. F; Fax Message Sequence No. FXP81191, App. Ex. G.) Scott required Refinery to pay cash in advance for each shipment. (Scott Invoice No. 227450, App. Ex. H; 8/4/98 Scott Invoice, App. Ex. I; Hashemi Dep. at 43.)

Scott released the first shipment of gas testers to Refinery on or about April 29, 1998. (Scott Invoice No. 227450; Hashemi Dep. at 57-58.) The DOC monitored the arrival of the shipment on May 6, 1998, at Refinery's Budd Lake, New Jersey address and the shipment being repackaged into a wooden crate and ultimately taken to British Airways at JFK International Airport for export out of the United States. (Dunberg Aff. ¶¶ 12-15, 16-19.)

U.S. Customs intercepted the original shipment of 50 gas testers at JFK International Airport. A Refinery invoice and air waybill, both dated May 7, 1998, indicated that the first shipment of 50 gas testers was sold to Starmount "268 REGENTS PARK ROAD, LONDON N3 3HN ENGLAND" for shipment to "EMBASSY FREIGHT SERVICES EUROPE (GERMANY)" (5/7/98 Refinery Invoice, App. Ex. J; 5/7/98 Air Waybill, App. Ex. K.) The DOC and U.S. Customs replaced the original shipment with 50 gas testers that Scott supplied to the DOC that had been rendered temporarily "inoperable" through the removal of their battery holders. (Doveala Dep. at 127-135; Dunberg Aff. ¶¶ 19-21.) The 50 gas testers that had been rendered temporarily inoperable were never returned to Scott. (Doveala Dep. at 135-136.)[3]

The DOC returned the original, intercepted shipment to Scott. (Dunberg Aff. ¶ 21.) Notably, Refinery had removed all serial numbers and identifying markings from the

---

[3]    Had it turned out that Refinery's purchase of the gas testers was not illegal, Scott would have air mailed the battery holders to Refinery and Refinery could have easily installed them in the gas testers. (Doveala Dep. at 138, 143.)

instruments. (Doveala Dep. at 140-141, 148-149; Dunberg Aff. ¶¶ 20, 22; Hashemi Dep. at 66-68.)

Refinery submitted a revised purchase order to Scott on July 15, 1998, to cover the remainder of the order. (7/15/98 Refinery Purchase Order, App. Ex. L.) The quantity of the remainder of the order had been increased by five to 195 (for a total of 245, the exact quantity of the Overseas Steel Corporation inquiry) and was to be shipped in wooden boxes within two weeks of Scott's receipt of the first payment toward the order. (*Id.*) In addition, there were to be "NO LABELS OR MARKINGS ON THE BOXES." (*Id.*) The total price of the shipment was $115,025, the amount of the damages Refinery is claiming in this litigation. (*Id.*)

Although Refinery initially claimed that Starmount had not paid for any portion of the second shipment, Refinery's President, Mahmood Reza Hashemi, agreed at his deposition that Starmount paid Refinery for a portion of the second shipment. (Hashemi Dep. at 128-133.) Refinery's former attorney, Frank S. Occhipinti, notified U.S. Customs that Starmount paid Refinery "$40,000 in U.S. Dollars as down payment for the [second] shipment." (9/17/98 Letter from Refinery's former attorney, Frank S. Occhipinti to Ron Simon, Director, Fines, Penalties & Forfeitures, U.S. Customs Service, App. Ex. M, at 2.)

Scott delivered the second shipment of gas testers to Refinery on or about August 12, 1998. (8/4/98 Scott Invoice, App. Ex. N.) At the request of the DOC, Scott removed the battery holders from this shipment of gas testers before it was delivered. (Doveala Dep. at 152.) The DOC also sought authority from the appropriate federal district court to install an electronic beeper in this shipment to monitor its movement. (Dunberg Aff. ¶ 30.) Again, the air waybill indicated that the shipment was destined for Germany. (8/10/98 Air Waybill, App. Ex. O.) The

air waybill for the second shipment, however, did not make any reference to Starmount. (*Id.*) That second shipment of gas testers never left JFK International Airport because it was seized.

U.S. Customs seized the second shipment of 195 gas testers at JFK International Airport in New York on August 19, 1998. Ron Simon, the Director of Fines, Penalties & Forfeitures, Department of the Treasury, U.S. Customs, sent a notice advising Refinery that the shipment had been seized because the exportation was in violation of executive orders prohibiting the exportation of all goods and services to Iran. (Notice of Seizure, App. Ex. P.)

Refinery sought the release and return of the second shipment of gas testers, but that request was denied because Refinery was under criminal investigation by the DOC. (9/17/98 Occhipinti Letter; Denial of Release from Ron Simon to Frank S. Occhipinti, App. Ex. Q.)

Refinery was charged in the United States District Court for the District of New Jersey with "knowingly and willfully violating and attempting to violate an order issued under Chapter 35 of Title 50 of the U.S.C., specifically Executive Order No. 13059 issued August 19, 1997, which prohibited the export of goods, technology, and services from the United States to Iran, and to a third country, with knowledge or reason to know that such goods, technology, and services were intended for transhipment and reexportation to Iran." Refinery pled guilty on November 9, 2000 to that charge. (Waiver of Indictment, App. Ex. R; Plea Agreement, App. Ex. S at 1; Plea Transcript ("Plea Tr."), App. Ex. T, at 9-10; Judgment, App. Ex. U, at 1.)

Refinery authorized its former attorney, Shalom Stone, to act as its representative at the plea hearing, and he testified under oath that he had advised Refinery of the rights it would surrender in pleading guilty. (Plea Tr. at 8-15.) In accepting Refinery's plea, the court

questioned Mr. Stone and was satisfied that there was a factual basis for the plea and that the

plea had been entered voluntarily:

        THE COURT:        And in general is the corporation guilty of the offense which is charged in the information?

        MR. STONE:        Yes, your Honor.

        THE COURT:        And I will run through the questions which have been prepared in advance.

        MR. STONE:        I should add for the record, your Honor, that I have gone over the questions with the corporate representatives.

        THE COURT:        All right.  And you are authorized, I assume, to get the answers which you are about to get.

        MR. STONE:        Yes, your Honor.

        THE COURT:        And have you been authorized to represent Refiner[y] [Industries], Inc. in this plea hearing, including for the purposes of entering a plea agreement on behalf of [Refinery Industries], Inc.

        MR. STONE:        Yes.

        THE COURT:        As early as March of 1998, to on or about August 14th, 1998, did Refinery Industries, Inc. conduct business from an office in Budd Lake, New Jersey?

        MR. STONE:        Yes.

        THE COURT:        From at least as early as March, 1998, to on or about August 14, 1998, was Refinery Industries, Inc. engaged in the export of commercial goods, merchandise, and other items specifically and exclusively Scott [D]-15 gas testers from the United States to other countries?

        MR. STONE:        Yes, that's limited to the gas testers, that is true –

        THE COURT:        Pardon?

        MR. STONE:        As limited to the testers, that is true.

        THE COURT:        Was Refiner[y] Industries, Inc. aware of the embargo?

MR. STONE:          Yes.

THE COURT:          **And between March 19, 1998, and August 14th, 1998, did Refinery Industries, Inc. export and attempt to export 245 nonmilitary Scott [D]-15 gas testers from the United States?**

MR. STONE:          **Yes.**

THE COURT:          **When the Refinery Industries, Inc. exported and attempted to export the gas testers from the United States to Iran, was it aware that the United States' embargo prohibited such exports?**

MR. STONE:          **Yes.**

THE COURT:          **And at the time Refinery Industries, Inc. committed these acts, did it know or have reason to know that the gas testers were intended for shipment directly or indirectly to Iran.**

MR. STONE:          **Yes.  At the time the defendant did have reason to know that the testers were intended for shipment to Iran.**

THE COURT:          **All right.  And at the time Refinery Industries, Inc. committed these acts, did it do so knowingly and willfully.**

MR. STONE:          **Yes.**

THE COURT:          **All right.  I've asked you these various questions and you've answered them, it is still your wish to enter on behalf of the corporation a plea of guilty to the information?**

MR. STONE:          **Yes, your Honor.**

THE COURT:          All right.  I conclude that the corporation has duly authorized you to appear on its behalf, that there – the plea agreement sets forth all the terms of the agreement between yourself and – between the corporation and the Government.  The corporation is voluntarily entering into this plea agreement, has given up its rights, which it otherwise would have, and there is a factual basis for the plea.  The guilty plea will be entered and we'll set a sentencing date of.

(Plea Tr. at 16-18 (emphasis added).)

The New Jersey district court sentenced Refinery to five years probation during which time Refinery was prohibited from "engaging in the export of commercial goods,

merchandise, or other material to any foreign country, either directly or indirectly, in its own name or any other name, or through its officers and directors or another person or entity." (Sentencing Transcript ("Sentencing Tr."), App. Ex. V, at 5.) The court waived the fine due to its finding that Refinery did not have the ability to pay the fine, and Refinery was ordered to pay only a four hundred dollar special assessment. (*Id.* at 5-6.)[4] Moreover, although Refinery had originally negotiated the option of making a $50,000 payment in lieu of forfeiture of the seized gas testers, Refinery exercised the option of a straight forfeiture because it claimed that the gas testers were "inoperative." (Plea Tr. at 8, 12.)[5]

After entering its plea and despite having agreed to the forfeiture of the seized gas testers, Refinery again sought the release and return of the second shipment of gas testers after the criminal investigation concluded. (5/1/01 Letter from Shalom D. Stone to Ron Simon, App. Ex. Y.) Again, U.S. Customs declined to release and return the gas testers. The request was denied because Refinery failed to pay $50,000 in lieu of forfeiture. U.S. Customs therefore indicated its intent to commence administrative forfeiture proceedings to take title of the gas testers. (Second Denial of Release from Ron Simon to Shalom D. Stone, App. Ex. Z.) There is no evidence to indicate that the seized gas testers were ever returned to Scott.

---

[4]     Refinery also entered into a settlement agreement with the Office of Export Enforcement, Bureau of Export Administration ("BXA") after the BXA notified Refinery of its intention to initiate an administrative proceeding against it pursuant the Export Administration Act of 1979 and the Export Administration Regulations, based on the same facts that were at issue in the criminal proceeding. (3/12/01 BXA Order, App. Ex. W.) As part of that settlement agreement, Refinery agreed to pay a civil penalty of $22,000 and to suspend its export business from the United States that is subject to the regulations it had violated for a period of at least five years. (*Id.*) Refinery failed to pay the civil penalty. (Hashemi Dep. at 164-167.)

[5]     Refinery became aware that the gas testers had been rendered inoperable by May 16, 2000. (*See* 5/16/00 Letter from Assistant U.S. Attorney Vaughn L. McKoy to Shalom Stone, Refinery's former attorney, App. Ex. X, referencing "the fact that the gas testers are inoperable".)

On July 19, 2002, Refinery filed a complaint against Scott asserting claims of fraud, breach of contract and unjust enrichment. Scott answered Refinery's averments, disputing the legality and enforceability of the contract at issue and also preserving its defense that Refinery's fraud claim is time-barred.

## ARGUMENT

## I.    THE STANDARDS FOR SUMMARY JUDGMENT ARE MET

Scott's motion seeks summary judgment under Rule 56. Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment "be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The substantive law identifies which facts are material, *i.e.*, those that determine the outcome on the merits. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). Once the moving party has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Only "genuine" disputes over "material" facts -- facts which might affect the outcome of the suit under the governing law -- will properly preclude summary judgment. *Anderson*, 477 U.S. at 248. If the evidence proffered by the

nonmovant is merely colorable or not significantly probative, there is no issue for trial and summary judgment is appropriate. *Id.* at 249-50.

Because the material facts that support Scott's motion cannot reasonably be in dispute, summary judgment is warranted.

> **A.    Refinery is not entitled to recover damages against Scott for breach of contract or unjust enrichment because its claims are grounded on a purchase order rendered illegal and unenforceable by Refinery's admitted, illegal conduct.**

The purchase order that is at issue in this action was directly connected to an illegal transaction rendering it illegal and unenforceable. Refinery is, therefore, barred from any recovery in this action.

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (internal quotation marks omitted) (noting the holding in *McMullen v. Hoffman*, 174 U.S. 639 (1899), that illegal promises will not be enforced in cases controlled by federal law).

The contract at issue in this action, although not illegal on its face, was certainly illegal "by its direct connection with an illegal transaction." *National Petrochemical Co. of Iran ("NPC") v. M/T Stolt Sheaf*, 930 F.2d 240, 243 (2d Cir. 1991) (prohibiting NPC from enforcing contracts that were "admittedly part and parcel of a larger plan to violate the United States trade embargo"). Like Refinery, the NPC sought to recover damages in connection with a transaction that violated a United States trade embargo. The NPC sought damages from a tanker company for its failure to deliver chemicals destined for Iran. *Id.* at 241. The district court granted summary judgment in favor of the shipping company and barred the NPC from recovery because the NPC had knowingly violated United States law that imposed an embargo on the sale or

transfer of items, products, and commodities to Iran. *Id.* at 242. The circuit court affirmed, holding that each contract at issue "was a component . . . of a scheme to transport the cargoes for payment of monies between the U.S. and Iran, without detection in contravention of the then existing laws and trade embargoes between the two countries." *Id.* at 243. The contracts underlying that transaction were "admittedly part and parcel of a larger plan to violate the United States trade embargo." *Id.* Although the NPC claimed that is was unaware of the illegal origin of the chemicals and the court recognized that the NPC "might [have been] entitled to enforce the contracts if it had been truly unaware of the illegality," the "NPC failed . . . to raise a genuine issue with respect to its claimed ignorance." *Id.*

The facts of this case are far more compelling than those in *NPC v. M/T Stolt Sheaf.* It indisputable that Refinery knowingly violated United States law that imposes an embargo upon the sale or transfer of products to Iran. Although Refinery will, no doubt, attempt to deny its illegal activity, it must be collaterally estopped from doing so because a defendant who pled guilty in an earlier criminal action is estopped in subsequent civil actions against other parties from contesting the facts that were essential elements in the criminal action. *Mayberry v. Somner*, 480 F. Supp. 833, 838 (E.D. Pa. 1979) ("[A]s a general matter it is proper to apply principles of collateral estoppel to bar the claim of a civil litigant who has previously pleaded guilty to a criminal charge involving the same issues."). *See Salvation Army v. Dumont Export Corp.*, No. 85-5685, 1986 U.S. Dist. LEXIS 19497, * 6-7 (E.D. Pa. 1986); *Railford v. Abney*, 695 F.2d 521, 523-24 (11th Cir. 1983); *Nathan v. Tenna Corp.*, 560 F.2d 761, 763-64 (7th Cir. 1977); *Brazzell v. Adams*, 493 F.2d 489, 490 (5th Cir. 1974); *Metros v. United States District Court*, 441 F.2d 313, 317 (10th Cir. 1971). Refinery must be collaterally estopped from denying the illegality of its purchase order because it pled guilty to a criminal charge in connection with

the very same purchase order. As confirmed by the record of the criminal proceeding and the plea colloquy, Refinery admitted the facts that establish the illegality of the purchase order when it pled guilty. *See Chisholm v. Defense Logistics Agency*, 656 F.2d 42, 47-48 (3d Cir. 1981) (requiring the court to examine the record of the criminal proceeding and plea colloquy to determine the issues decided by the guilty plea).

        The record in the underlying criminal proceedings is crystal clear. Refinery was charged with knowingly and willfully violating a trade embargo that prohibits the export of goods to Iran. The relevant portions of the plea colloquy include Refinery's admission that it was aware of the trade embargo, yet exported and attempted to export the gas testers at issue in the present case, having reason to know that the gas testers were intended for shipment to Iran. In no uncertain terms, Refinery admitted that it violated the trade embargo knowingly and willfully. The New Jersey district judge reviewed the elements of the crime with Refinery's representative and explicitly warned Refinery that by entering into this plea agreement it would waive rights it would otherwise have. Refinery responded that it understood the elements of the offense to which it admitted guilt. All possible doubt that the plea constituted an admission by Refinery that it had knowingly and willfully violated the trade embargo is removed by the court's extensive inquiry into the factual basis of Refinery's plea. Refinery, therefore, cannot be permitted to deny its illegal activity, especially when it does so to profit at the expense of Scott, an innocent party.

        Commanding Scott to make payment under the terms of the purchase order at issue here would have the bizarre effect of rewarding Refinery -- a company that knowingly violated federal law by purchasing gas testers from Scott with knowledge or reason to know that they were destined for Iran -- for its admitted, illegal conduct. Part of Refinery's criminal

punishment was to forfeit the gas testers that are at issue. Allowing Refinery to obtain

reimbursement from Scott of the money it paid to obtain the gas testers would negate that

punishment and impose a punishment on the very party that cooperated with the government in

the investigation against Refinery. Surely, the law does not contemplate such an absurd

outcome. Indeed, one of the bases for collateral estoppel is to prevent endless, unwarranted

litigation. *Mayberry* 480 F. Supp. at 838 ("to permit defendants subsequently to deny their guilt

on charges to which they had pleaded guilty would result in endless, useless litigation").

**B.      Scott is entitled to summary judgment on Refinery's fraud claim because Refinery failed to bring the claim within the applicable statute of limitations.**

Refinery cannot be permitted to pursue its fraud claim because it neglected to file

the claim within the applicable statute of limitations.

The Pennsylvania statute of limitations applies to this diversity case. *See Ross v.*

*Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985) ("A federal court, sitting in diversity,

follows the forum's choice of law rules to determine the applicable statute of limitations" and

"Pennsylvania courts ordinarily apply the Pennsylvania statute of limitations."). The

Pennsylvania statute of limitations dictates that an "action or proceeding to recover damages for

injury to person or property which is founded on negligent, intentional, or otherwise tortious

conduct or other action or proceeding sounding in trespass, including deceit or **fraud**" "must be

commenced within two years." 42 Pa. C.S. § 5524(7) (emphasis added).

As explained in detail above, Refinery did not file its Complaint until July 19,

2002, nearly four years after Scott delivered the last shipment of gas testers that are the subject of

Refinery's claims. Scott's last delivery was in August of 1998. Moreover, Refinery was clearly

aware that the battery holders had been removed from the second shipment of gas testers by May

16, 2000, more than two years before Refinery filed its Complaint. (*See* 5/16/00 Letter from

14

Assistant U.S. Attorney Vaughn L. McKoy to Shalom Stone referencing "the fact that the gas testers are inoperable".)  Refinery is, therefore, time-barred from pursuing its fraud claim.

## **CONCLUSION**

Based on the foregoing, Scott respectfully requests that the Court enter summary judgment in favor of Scott and continue the March 20, 2003 arbitration hearing pending its ruling on summary judgment.

Respectfully submitted,

John G. Harkins, Jr., Esquire (04441)
Barbara Brigham Denys, Esquire (78562)
HARKINS CUNNINGHAM
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042
(215) 851-6700

Attorneys for Defendant
Scott Technologies, Inc.

Dated: March 10, 2003

## CERTIFICATE OF SERVICE

I, Barbara Brigham Denys, Esquire, hereby certify that true and correct copies of

the foregoing Proposed Orders, Motion, Memorandum of Law and Appendix were served

via First Class Mail on March 10, 2003, on counsel listed below:

    Michael R. Needle, Esquire
    P. O. Box 56332
    Philadelphia, PA  19130

A true and correct copy of the foregoing will also be handed to Mr. Needle on

March 11, 2003 per his request.

                              _____
                              Barbara Brigham Denys

Dated:  March 10, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REFINERY INDUSTRIES, INC.  :
           :
    v.      :  NO. 02-CV-4847
           :
SCOTT TECHNOLOGIES, INC.  :

## APPENDIX

| Tab | Exhibit |
|-----|---------|
| A | 3/3/98 Refinery Purchase Order |
| B | Transcript of Deposition of Neil Doveala |
| C | Transcript of Deposition of Mahmood Reza Hashemi |
| D | Starmout Purchase Order |
| E | Affidavit of Scott Dunberg, DOC |
| F | 3/20/98 Funds Transfer Advice |
| G | Fax Message Sequence No. FXP81191 |
| H | Scott Invoice No. 227450 |
| I | 8/4/98 Scott Invoice |
| J | 5/7/98 Refinery Invoice |
| K | 5/7/98 Air Waybill |
| L | 7/15/98 Refinery Purchase Order |
| M | 9/17/.98 Letter from Refinery's former attorney, Frank S. Occhipinti to Ron Simon, Director, Fines, Penalties & Forfeitures, U.S. Customers Service |
| N | 8/4/98 Scott Invoice |
| O | 8/10/98 Air Waybill |

P            Notice of Seizure

Q            Denial of Release from Ron Simon to Frank S. Occhipinti

R            Waiver of Indictment

S            Plea Agreement

T            Plea Transcript

U            Judgment

V            Sentencing Transcript

W            3/12/01 BXA Order

X            5/16/00 Letter from Assistant U.S. Attorney Vaughn L. McKoy to Shalom
             Stone, Refinery's former attorney

Y            5/1/01 Letter from Shalom D. Stone to Ron Simon

Z            Second Denial of Release from Ron Simon to Shalom D. Stone