```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


REFINERY INDUSTRIES, INC.     :   NO. 02-CV-4847
                              :
vs.                           :
                              :
SCOTT TECHNOLOGIES, INC.      :
```

**ORDER**

AND NOW, this    day of                    , 2003, upon consideration of plaintiff's motion for reconsideration, it is hereby ORDERED that said motion is GRANTED and the Court's Order of June 3, 2003 is hereby VACATED.


　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　DALZELL, U.S.D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REFINERY INDUSTRIES, INC.      :   NO. 02-CV-4847
                               :
vs.                            :
                               :
SCOTT TECHNOLOGIES, INC.       :

**MOTION FOR RECONSIDERATION**

Plaintiff, Refinery Industries, Inc., by its undersigned counsel, respectfully moves the Court to reconsider and vacate its Order of June 3, 2003 granting summary judgment in favor of defendant for the reasons set forth in the accompanying Memorandum of Law.

RESPECTFULLY SUBMITTED,

_____
MICHAEL R. NEEDLE, P.C.
MICHAEL R. NEEDLE
Post Office Box 56332
Philadelphia, PA  19130
215-236-7420
216-236-7460(F)
Attorneys for Plaintiff

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REFINERY INDUSTRIES, INC.      :   NO. 02-CV-4847
                               :
vs.                            :
                               :
SCOTT TECHNOLOGIES, INC.       :
```

**MEMORANDUM OF LAW**

Plaintiff, Refinery Industries, Inc. ("Refinery"), respectfully submits this Memorandum of Law in support of its motion for reconsideration.

<u>STATEMENT OF FACTS</u>

The relevant facts are set forth in the exhibits to defendants' motion for summary judgment, particularly tho deposition transcript of Neal Doveala, the deposition transcript of Reza Hashemi, the Affidavit of Scott Dunberg, the August 1998 invoice from Scott to Refinery, and the May 15, 2000 letter from the United States Attorney to Shalom Stone.

<u>ARGUMENT</u>

To obtain summary judgment, the movant "<u>must demonstrate</u> that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of the case." "<u>If</u> the movant can * * * demonstrate such a failure, the burden then shifts to the non-movant to identify which portions of the record support the allegedly unsupported element." <u>In re Phillips Petroleum Securities Litigation</u>, 881 F.2d 1236, 1243 (3rd Cir. 1989), citing <u>Celotex Corp. v. Catrett</u>, 417 U.S. 317 (1985). (emphases added)

Summary judgment is always improper "if reasonable minds could differ as to the import of the evidence." <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Thus, "[s]ummary judgment should be granted only where it is clear that here is no genuine dispute about either the facts or the inferences to be drawn from such facts." Teleprompter of Erie, Inc. v. City of Erie, 567 F.Supp. 1277, 1295 (W.D.Pa. 1983) citing United States v. Diebold, Inc., 359 U.S. 654, 655 (1962).

As noted by the Court in its June 3, 2003 order, a summary judgment motion "may not be granted as uncontested but must be considered on the merits." Local Rule 7.1(g) provides for motions for reconsideration. As explained in Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1986), cert. den. 476 U.S. 1171, "The purpose of a motion for reconsideration is to correct manifest errors of law or fact" Plaintiff respectfully submits that the Court made manifest errors of law or fact in its ruling, as set forth below.

A. CONTRACT CLAIM

The Court characterized Refinery's contract claim as an effort "to recover the investment it made when it tried to smuggle gas testers to Iran," Slip Op. ¶(c), and held that "because the contract is part and parcel of a larger plan to provide gas testers to Iran in violation of the United States Trade embargo, it is enforceable. Id., ¶(j), citing National Petrochemical Co. V. T/T Stolt Sheaf, 930 F.2d 240 (2d Cir.

2

1991).

Plaintiff respectfully submits that this ruling erroneously fails to apply North Carolina principles governing the defense of illegality. The Court also resolved disputes offact in favor of defendant in violation of Rule 56.

This is a diversity case. Contract issues are therefore controlled by law of the forum state, Pennsylvania, including its choice of law rules. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). This applies to the defense of illegality to a contract claim raised here. See: Vector Security Inc. v. Stewart, 88 F.Supp2d 395, 399n.3 (E.D.Pa. 2000).[1]

"Pennsylvania applies the law of the place with the most interest in the contract and that is most intimately concerned with the outcome." Vector Security, supra. That is North Carolina, where Refinery's order was sent, where it was accepted by Scott, where the goods were made, from where the goods were shipped, and to where payment was made. See: Craig v. W.J. Thiele & Sons, Inc., 149 A.2d 35 (Pa. 1959)( "the place of making a contract is not where the offer is made but where it is accepted.").

North Carolina courts follow the general rule, enunciated by the Court, that courts will not enforce an illegal contract. They also hold that party to an executed but illegal contract is

---

[1] National Petrochemical Co. V. T/T Stolt Sheaf, 930 F.2d 240 (2d Cir. 1991) does not hold otherwise. It simply does not address the question of whether federal or state law controls or which state law controls, presumably because there was no conflict of law.

entitled to restitution if that party is not in pari delicto. See: <u>Bessemer Imp. Co. v. Grensboro</u>, 101 S.E.2d 336 (N.C. 1958); Davis v. Smoot, 97 S.E.2d 488 (N.C. 1918); <u>Occidental Life Ins. Co. of North Carolina v. Part Ryan and Associates</u>, Inc., 496 F.2d 1255 (4th Cir. 1974), cert. den. 419 U.S. 1023.[2]  The Court did not apply this doctrine or consider the material facts relating to this doctrine.

The Dunberg Affidavit indicates that Neil Doveala of Scott knew at all times that Refinery's purchaser, Starmount, intended to reship the goods to Iran as a result of receipt of a prior order identical to Starmount's from an entity named Overseas Steel Corp. and information and documents from an unnamed informant, DN, that these goods were destined for Iran.  As stated in the Dunberg Affidavit ¶¶ 2, 7, 10:

> 2.   On or about September 11, 1997 an employee of Scott, Inc. ... was contacted by a DN.  DN, who was previously unknown to them.  DN, who was previously unknown to them, stated that he learned that Overseas Steel Corporation ... would place an order with Scott, Inc. for the purchase of 245 Scott D-15 Gastesters (with brass probe attachments).  DN advised Scott Inc. that the end use of the D-15 Gastesters was The National Iranian Gas Company...  DN also advised Scott, Inc. that filling the order for the D-15 Gastesters would be a violation of the United States trade embargo with Iran.  DN faxed to Scott, Inc. Documents that supported his statements that the D-15 Gastesters would be shipped to Iran.
>                     * * *
> 7.   On March 20, 1998, CI-1 advised Special Agents with the DOC that after Scott, Inc. accepted the purchase order submitted by Refinery for the Gastesters, Scott, Inc.

---

[2]  Accord: <u>National Petrochemical Co. V. T/T Stolt Sheaf</u>, 930 F.2d 240 (2d Cir. 1991)(applicable law undetermined); <u>In re Resorts International, Inc</u>., 181 F.2d 505, 512 (3d Cir. 1999) (applying New Jersey law).

noticed that the order was almost identical to plans by a company named Overseas Steel Corporation to purchase Gastesters from shipment to Iran in August 1997.  CI-1 stated that the plans by OSC to purchase the Gastesters did not go forward because Scott, Inc. Received information from DN that OSC planned to ship the 245 D-15 Gastesters (and brass probe attachments) to the National Iranian Gas Company, Tehran Iran.

\* \* \*

10. **CI-1 was confident that the Gastesters ordered by Refinery were destined for Iran ...**

Mr. Doveala admitted that he was CI-1. Tr. P. 83. He also admitted that it was illegal to sell to Refinery with the knowledge that Refinery's purchaser would resell to Iran. Tr. pp. 121-22.

Mr. Doveala testimony reflects throughout that Scott wished to complete and profit from what it knew to be an illegal transaction by obtaining the government's permission to do so and by assisting the government in a sting involving the shipment of defective gas testers and the issuance of false certifications.

There is no evidence that Refinery knew Starmount's intentions. To the contrary: Doveala did not disclose any of the information received from "DN" to Refinery, Tr. pp. 100-02, and Hashemi testified that Starmount had been referred to him by his brother and that his brother had assured him that Starmount was not reshipping the goods to Iran. Tr., pp. 23-28, 35-37, 177-78.

After investigation, the government dropped all charges against Hashemi in exchange for a plea from Refinery that it had "reason to know" -- an unlikely course if the government believed that Hashemi was a professional smuggler or Iranian agent bent on circumventing the government's embargo against power hostile to the United States.[3]

Against this backdrop, a jury could find Refinery in fact did not know of Starmount's intentions; that Scott did; and that

---

[3] Hashemi, while born in Iran, is a refugee from the Iranian regime, a naturalized citizen, a full time engineer -- not a professional exporter. Hashemi Tr., pp. 1-22.

6

Scott encouraged Refinery to go forward with a transaction which Scott knew to be an illegal in order to profit from a transaction which it knew to be illegal and to defraud Refinery.

Or the jury might find, as Scott would urge it to do, that Hashemi is a smuggler or Iranian agent; that Refinery really knew; that Scott was being a good citizen by setting up Refinery and going ahead with the transaction rather than by refusing to make what it knew to be an illegal sale; and that Refinery and Hashemi "got off easy."

Such issues cannot be resolved without assessing the credibility of Hashemi, Doveala and other material witnesses whose testimony is not in the record (e.g. Scott Dunberg, Shalom Stone) and determining what inferences to draw from the documents. The Court, in characterizing Refinery as a "smuggler" and charging it with "chutzpah" by alleging "that defendant committed 'fraud' by cooperating in a Government sting operation,"[4] appears to have resolved these credibility issues and drawn inferences in favor of Scott and against Refinery. Plaintiff respectfully submits that this violated Rule 56.

Additionally, the North Carolina courts have repeatedly held that "courts will not extend the terms of a penal contract to avoid a contract unless such a result was within the intent of the legislature in enacting the statute." See: <u>Furr v. Fonville</u>

---

[4] The Dunberg Affidavit clearly indicates that the Government did not enlist Scott's aid in an ongoing sting operation; rather the sting operation was commenced by the Government at the behest of Scott.

7

Morrisey Realty, Inc., 503 S.E.2d 401, 405 (N.C.App. 1998), citing Marriott Finance Services v. Capital Funds, Inc., 217 S.E.2d 551, 556 (N.C. 1975) and reasoning:

> illegality is a defense to the enforcement of an otherwise binding, voluntary contract in violation of a statute only where the party seeing to void the contract is a victim of the substantive evil the legislature intended to prevent.
>
> Accord: *Restatement of Contracts 2d, §178,* which states that

the availability of defense of illegality depends in part on whether a forfeiture and the intention of the legislature:

> (2) in weighing the interest in the enforcement of a term, account is taken of
>
>> a. The parties' justified expectations.
>>
>> b. Any forfeiture that would result if enforcement were denied, and
>>
>> c. Any special public interest in enforcement of the particular term.
>
> (3) in weighing a public policy against enforcement of a term, account is taken of
>
>> a. The strength of that policy as manifested by legislation or judicial decisions.
>>
>> b. The likelihood that a refusal to enforce the term will further that policy,
>>
>> c. The seriousness of any misconduct involved and the extent to which it was deliberate, and
>>
>> d. The directness of the connection between that misconduct and the term.

The penal statute 50 U.S.C. §1705, was intended to promote the foreign policy objectives of the United States by punishing violators of trade embargos -- not as a device by which Refinery or others can ship defective goods and obtain payment with impunity. It does not bar violators from enforcing contract

8

rights and remedies which they may have at state law against vendors. Rather it imposes specified criminal penalties on violators.

    Plaintiff respectfully submits that the Court, to the extent it held the penal statute to ipso facto bar this claim, erred.

B. FRAUD

The Court granted summary judgment on Refinery's fraud claim on grounds that "Refinery did not file this action until July 19, 2002, more than two years from the latest date that Refinery discovered the asserted "fraud," reasoning that:

> On May 16, 2000, the Government notified Refinery in the context of its criminal investigation that the gas testers which Scott has supplied Refinery were "inoperable." Mot. Summ. J., Ex. W. Of course, Refinery probably discovered that the gas testers were inoperable long before that -- when it received then in August of 1998. Mot. Summ. J., Ex. I.

Slip Op., ¶(f) and n.5.

This ruling contains manifest errors of fact and incorrectly applies Pennsylvania tolling principles.

The fraud alleged in the Complaint is that "Scott represented, orally and in the writings described above, that it would supply and had in fact shipped 245 authentic, functioning and tested Scott D-15 Gastesters w/brass probes to Refinery and/or to shippers designated by Refinery whereas in fact: A. Scott had no intention of supplying Refinery with this merchandise due to Scott's suspicions that Refinery's purchaser, Starmount, in fact intended to resell them to Iran. B. Scott did not test the merchandise the shipped. C. Scott at all times intended to ship and did ship worthless, non-functioning dummy testers."

Mr. Doveala admitted making the certifications in question; that the goods were intentionally shipped in a defective and non-conforming state; and that none of this was ever disclosed by

10

Scott to Refinery, either prior to the transaction or thereafter. Tr., 136, 162-64.

Contrary to the Court's findings, it is undisputed that the gas testers were **never** received by Refinery in a defective condition:

-- The first 50 were sent and received in good condition, with 50 defective testers being substituted for good testers and the 50 good testers being returned to Scott **after** these 50 good testers were reshipped by Refinery to JFK International Airport. Dunberg Affidavit ¶21, Doveala Tr. pp. 128-35.

-- The remaining 195 testers, which were sent out in a defective condition, were **not** sent to Refinery; rather Scott shipped them directly to an air freight carrier at JFK airport. Dunberg Affidavit ¶29, Doveala Tr. pp. 161.[5]

The May 16, 2000 letter cited by the Court does **not** state that Scott rendered the gas testers inoperable or shipped them in a defective condition.  The letter states only that "the gas testers are inoperable" and "as such it may be difficult for your client to sell them domestically as we originally contemplated," without any clue as to how or why they are inoperable or by whom, when or how they were made so.

The Dunberg Affidavit reveals the facts underlying the fraud claim: that Scott, by arrangement with Dunberg, rendered the

---

[5]. This is also clearly indicated by the August 29, 2000 invoice, which the Court mistakenly cited for the fact that the 195 defective testers were sent to Refinery.  The invoice states that shipment is to a carrier at the airport --**not** Refinery.

11

testers defective, issued false certifications to the contrary, and concealed this from Refinery as part of a sting instigated by Mr. Doveala statements to Dunberg that he was "confident" that Iran was the ultimate destination. The fraud allegations of the Complaint track the Dunberg Affidavit. There is no evidence in the summary judgment record as to when plaintiff received this Affidavit or became aware of these facts.

As explained in <u>Sheet Metal Workers v. 2300 Group, Inc</u>,, 949 F.2d 1274, 1282 (3d Cir. 1991), Pennsylvania's two year statute of limitations on fraud begins to run "once a plaintiff possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it." (emphasis original). Thus, the statute only began to run in this case when Refinery knew that the goods were inoperable **and** that Scott had caused this and shipped them in this state.

Refinery knew the goods were "inoperable" and unsaleable on or about May 16, 2000. It did not know that Scott had shipped them in this state because the letter does not disclose this. Because the Court did not consider the question of when plaintiff first saw the Dunberg Affidavit or otherwise learned such information and could not have done so, the Court erred in granting summary judgment on the statute of limitations. See

Beauty Time, Inc. v. VU Skin Systems, Inc., 118 F.3d 140, 149 (3d Cir. 1997), reversing the dismissal of a complaint in similar circumstances, explaining:

> [If the plaintiffs knew of this conduct in 1991, then the suit should have been brought within two years of that discovery and should now properly be deemed time-barred. However, if the plaintiffs did not learn of this alleged fraud until 1994, then the action brought in 1995 is well within the two-year statute of limitations for fraud estab lished by Pennsylvania law.
>
> The district court, however, failed to determine when the plaintiffs actually learned of the alleged fraudulent re-registration.  Thus, the order dismissing the complaint must be vacated and the matter remanded to the district court for further proceedings to determine when the plaintiffs first became aware that Vujevich was using the DPM trade mark...

13

**CONCLUSION**

For the foregoing reasons, plaintiff respectfully submits that the Court's Order of June 3, 2003 should be reconsidered and vacated.

        RESPECTFULLY SUBMITTED,

        _____
        MICHAEL R. NEEDLE, P.C.
        MICHAEL R. NEEDLE
        Post Office Box 56332
        Philadelphia, PA  19130
        215-236-7420
        216-236-7460(F)
        Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing motion was sent by mailed counsel for defendant, Barbara Brigham Denys, Harkins Cunningham, 2800 One Commerce Square, 2005 Market Street, Philadelphia, PA 19103 (215-851-6710) on June 17, 2003.

_____
MICHAEL R. NEEDLE